UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

SECURITIES INVESTOR PROTECTION           :
CORPORATION,                             :        Adv. P. No. 08-01789 (SMB)
                                         :
              Plaintiff,                 :        SIPA LIQUIDATION
                                         :
        v.                               :        (Substantively Consolidated)
                                         :
BERNARD L. MADOFF INVESTMENT             :
SECURITIES LLC,                          :
                                         :
              Defendant.                 :

----------------------------------------------------------X
                                         :
In re:                                   :
                                         :
BERNARD L. MADOFF,                       :
                                         :
              Debtor.                    :

----------------------------------------------------------X
                                         :
SUSANNE STONE MARSHALL, ADELE FOX,       :
MARSHA PESKIN, and RUSSELL OASIS,        :
                                         :        Adv. P. No. 15-01293 (SMB)
              Plaintiffs,                :
                                         :
        v.                               :
                                         :
CAPITAL GROWTH COMPANY, *et al.*,        :
                                         :
              Defendants.                :

----------------------------------------------------------X

## MEMORANDUM DECISION DENYING
## MOTION FOR DECLARATORY JUDGMENT
## AND DISMISSING COMPLAINT

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111

        David J. Sheehan, Esq.
        Deborah H. Renner, Esq.

Tracy L. Cole, Esq.
Keith R. Murphy, Esq.
Amy Vanderwal, Esq.
Ferve Ozturk, Esq.
Samuel M. Light, Esq.
        Of Counsel

*Attorneys for Irving H. Picard, Trustee*
  *for the Liquidation of Bernard L. Madoff*
  *Investment Securities LLC*

CHAITMAN LLP
465 Park Avenue
New York, NY 10022

Lance Gotthoffer, Esq.
Helen Davis Chaitman, Esq.
        Of Counsel

*Attorneys for the Fox Parties*

SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022

William D. Zabel, Esq.
Marcy Ressler Harris, Esq.
Michael Kwon, Esq.
Jennifer M. Opheim, Esq.
Mark D. Richardson, Esq.
        Of Counsel

*Attorneys for the Picower Parties*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge**

Certain former customers of Bernard L. Madoff Investment Securities LLC

("BLMIS") have filed a *Complaint*, dated Aug. 29, 2015 ("*DJ Complaint*") (ECF Doc. #

1)[1] and related motion, (*see Memorandum of Law in Support of Motion for Declaratory*

*Judgment*, dated November 9, 2015 ("*Fox Brief*") (ECF Doc. # 18)),  seeking a

---

[1]    "ECF Doc. # ___" refers to documents filed on the electronic docket of this adversary proceeding.

declaration that their proposed *Third Amended Complaint* ("*PTAC*")[2], which they hope to file in Florida District Court, asserts claims against the "Picower Parties"[3] that are not barred by the automatic stay or the permanent injunction described below. The Picower Parties and Irving H. Picard ("Trustee"), the trustee for the liquidation of BLMIS under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), oppose the application and seek a declaration that the proposed claims, like their earlier iterations, are barred. For the reasons stated, the application is denied, and the *DJ Complaint* is dismissed.

## BACKGROUND

The background to Bernard L. Madoff's infamous Ponzi scheme has been recounted in numerous decisions of this Court, the District Court and the Second Circuit. *E.g.*, *Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*), 773 F.3d 411, 414-15 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015); *SIPC v. BLMIS* (*In re BLMIS*), 516 B.R. 18, 20-21 (S.D.N.Y. 2014); *SIPC v. BLMIS* (*In re BLMIS*), 424 B.R. 122, 125-32 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 25 (2012). The Court assumes familiarity with these decisions, and recounts only the facts necessary to address the instant application.

---

[2]    ECF Doc. # 1-1. References to the *PTAC* will be denoted as "(¶ ___)."

[3]    The "Picower Parties" include Capital Growth Company; Decisions, Inc.; Favorite Funds; JA Primary Limited Partnership; JA Special Limited Partnership; JAB Partnership; JEMW Partnership; JF Partnership; JFM Investment Companies; JLN Partnership; JMP Limited Partnership; Jeffry M. Picower Special Company; Jeffry M. Picower, P.C.; the Picower Foundation; the Picower Institute of Medical Research; the Trust F/B/O Gabrielle H. Picower; and Barbara Picower, individually, and as executor of the estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust F/B/O Gabriel H. Picower. Jeffry Picower will be referred to as "Picower."

### A.    The Settlement and the Permanent Injunction

Following Madoff's arrest in December 2008 and the revelation that the investment advisory side of BLMIS operated as a Ponzi scheme, BLMIS entered into liquidation proceedings pursuant to the SIPA.  The Trustee thereafter commenced numerous adversary proceedings to avoid and recover transfers BLMIS made to certain customers, including the Picower Parties.  The Trustee's suit against the Picower Parties sought recovery of $7.2 billion transferred from BLMIS to the Picower Parties from December 1995 to the collapse of BLMIS as, *inter alia*, fraudulent transfers under the Bankruptcy Code and New York law.  The Trustee alleged that the Picower Parties knew that BLMIS was a Ponzi scheme and actively participated by giving directions to BLMIS employees to create fictitious trading records in their accounts.  In addition, the Government separately pursued a civil forfeiture action pursuant to 18 U.S.C. § 981(a)(1)(C) against the Picower Parties.

The Trustee, Picower Parties and Government eventually entered into a global settlement (the "Settlement")[4] under which the Picower Parties agreed to pay $5 billion to the Trustee and forfeit $2.2 billion to the Government.  The Court's January 13, 2011 order approving the Settlement included the following permanent injunction (the "Permanent Injunction") in favor of the Picower Parties:

> ORDERED, that any BLMIS customer or creditor of the BLMIS estate who filed or could have filed a claim in the liquidation, anyone acting on their behalf or in concert or participation with them, or anyone whose claim in any way arises from or is related to BLMIS or the Madoff Ponzi scheme, is hereby permanently enjoined from asserting any claim against the Picower BLMIS Accounts or the Picower Releasees that is duplicative or derivative

---

[4]     A copy of the Settlement is available at ECF Adv. P. No. 09-01197 Doc. # 43-1.

of the claims brought by the Trustee, or which could have been brought by
the Trustee against the Picower BLMIS Accounts or the Picower Releasees.

(*See Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and
9019 of the Federal Rules of Bankruptcy Procedure Approving an Agreement by and
among the Trustee and the Picower BLMIS Account Holders and Issuing a Permanent
Injunction*, dated Jan. 13, 2011, at 7 (ECF Adv. P. No. 09-01197 Doc. # 43).)   The Trustee
agreed to "use his reasonable best efforts to oppose challenges, if any, to the scope,
applicability or enforceability of the Permanent Injunction" as part of the Settlement.
(Settlement, ¶ 7.)

## B.   Prior Attempts to Sue the Picower Parties

Prior to and since the issuance of the Permanent Injunction, two groups of
putative class action plaintiffs — the "Fox Parties"[5] and the "Goldman Parties"[6] — have
tried to circumvent the Permanent Injunction and the automatic stay by asserting
claims against the Picower Parties made to sound like they are personal and direct.
They involved allegations that Picower was a "control person" of BLMIS under section
20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and other claims arising
from the same conduct.   These attempts proved unsuccessful and resulted in nine
decisions from this Court, the District Court and the Second Circuit concluding that the
Permanent Injunction barred the claims.   *See Picard v. Fox* (*In re BLMIS*), 429 B.R. 423
(Bankr. S.D.N.Y. 2010), *aff'd*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012) ("*Fox I*"), *aff'd*, 740

---

[5]      The "Fox Parties" currently include Susanne Stone Marshall, Adele Fox, Marsha Peshkin, and
Russell Oasis, individually, and on behalf of a class of similarly situated plaintiffs.

[6]      The "Goldman Parties" included A & G Goldman Partnership and Pamela Goldman, individually,
and on behalf of a class of similarly situated plaintiffs.

F.3d 81 (2d Cir. 2014) ("*Fox II*"); *and SIPC v. BLMIS* (*In re BLMIS*), 477 B.R. 351

(Bankr. S.D.N.Y. 2012), *aff'd*, No. 12 Civ. 6109 (RJS), 2013 WL 5511027 (S.D.N.Y. Sept.

30, 2013) ("*Goldman I*"); *and Capital Growth Co. v. Marshall* (*In re BLMIS*), 511 B.R.

375 (Bankr. S.D.N.Y. 2014) ("*Fox III*"), *aff'd sub nom. Fox v. Picard* (*In re BLMIS*), 531

B.R. 345 (S.D.N.Y. 2015) ("*Fox IV*"); *and Picard v. A & G Goldman P'ship* (*In re*

*BLMIS*), 546 B.R. 284 (Bankr. S.D.N.Y. 2016) ("*Goldman II*"), *aff'd*, Nos. 1:16-cv-2058,

1:16-cv-2065 (GHW), 2017 WL 383490 (S.D.N.Y. Jan. 24, 2017) ("*Goldman III*").

As these decisions reflect, the pervasive problem with all the prior pleadings was
generally the same.  They alleged, in substance, that the Picower Parties withdrew vast
amounts of money from their accounts with BLMIS and caused the BLMIS employees to
doctor the records of their accounts.  The Picower withdrawals skewed the rest of
BLMIS' financial information and caused Madoff to send misleading financial
information to its customers who relied on the misinformation to invest with BLMIS.
The prior pleadings failed, however, to plead facts showing that Picower ever spoke with
or sent misleading financial information to any member of the putative class, or directed
BLMIS or Madoff to create or send misleading information.  Furthermore, the Picower
Parties' withdrawals harmed all customers in the same, indirect way by stealing assets
that would have been available to them, and ultimately, driving BLMIS into bankruptcy.

## C.   The Proposed Third Amended Complaint

This brings us to the *PTAC*.  The Fox Parties assert six claims against the Picower
Parties including "control person" liability under section 20(a) of the Exchange Act,
violations of federal and Florida RICO statutes, and breaches of Florida common law.
(¶¶ 111-97.)  According to the *PTAC*, Picower had a close business and social relationship

with Madoff, and began investing with Madoff in the late 1980s. Around 1987, Madoff

structured an investment at the insistence of Picower and a few other BLMIS customers

that benefitted them (including Madoff) if the stock market fell, but would expose them

to losses if the market rose. The stock market eventually went up, and Madoff owed "a

couple billion dollars" on account of the investment. Madoff then turned his business

"illegitimate" in order to cover the losses. (¶¶ 53, 54.) Picower was the primary

beneficiary of Madoff's Ponzi scheme, and pressured Madoff to expand his customer

base so that he could withdraw ever more funds. (¶¶ 55, 57, 58.)

> The thrust of the *PTAC* is that Picower exercised control over BLMIS by:
>
> 1. directing Madoff to make a margin loan of $6 billion, which was actually a theft of BLMIS funds, to one of the Picower Party's BLMIS accounts, (¶¶ 62-64);
>
> 2. agreeing to be listed as a counterparty on BLMIS' fake option trades to create the appearance of legitimate trading, (¶¶ 65-70);
>
> 3. loaning BLMIS $76 million in 1992 when a BLMIS feeder fund— Avellino & Bienes—was under SEC investigation and needed funds from BLMIS to repay Avellino & Bienes investors, (¶¶ 71-75);
>
> 4 loaning BLMIS $125 million in 2006 to fund BLMIS customer redemptions, (¶¶ 76-78); and
>
> 5. causing Madoff and other BLMIS employees to book phony transactions in the Picower Parties' BLMIS accounts to manufacture fictitious gains (or fictitious losses to reduce tax liabilities). (¶¶ 82-89.)

The fraudulent transactions which Picower allegedly directed caused BLMIS to misstate

its financial condition in regulatory disclosures and overstate the value of its assets in

BLMIS customers' account statements, including the statements sent to the Fox Parties.

(¶¶ 90-94.)

Thus far, the *PTAC* parrots the dismissed "*Goldman Complaint*"[7].  As here, the Goldman Parties alleged that Picower had a close business and social relationship with Madoff and invested with Madoff from the 1980s, (*Goldman Complaint*, ¶¶ 5, 63, 64), made secret loans to Madoff to prop-up BLMIS at times when it needed liquidity, (*id.*, ¶¶ 10, 67-75), agreed to be an options counterparty to make BLMIS transactions appear legitimate, (*id.*, ¶¶ 11, 76-80), directed BLMIS employees to manipulate Picower's accounts to create fictitious gains, (*id.*, ¶¶ 82-87), directed BLMIS employees to give a $6 billion margin loan to the Defendant Decisions Incorporated BLMIS account, (*id.*, ¶¶ 88-90), and, by engaging in fraudulent transactions with BLMIS, caused BLMIS to disseminate material misrepresentations in regulatory disclosures and customer statements.  (*Id.*, ¶¶ 7, 12, 91-96.)

The Fox Parties rely on two additional sources of information, or facts, which they say distinguish it from the last *Goldman Complaint*.  The *PTAC* attaches an August 7, 2012 deposition of Madoff ("Madoff Deposition") taken in connection with a case in the District Court styled *In re Optimal U.S. Litigation*, Case No. 10-cv-4095 (SAS) (S.D.N.Y.).  (*PTAC*, Ex. A.)  The Fox Parties also refer to a declaration by Madoff in another matter that, except for common counsel, had nothing to do with Picower but nonetheless took a gratuitous shot at him.  I discuss the deposition and declaration below.

---

[7]       The *Goldman Complaint* refers to the complaint filed by the Goldman Parties on August 28, 2014 against the Picower Parties, a copy of which is available at ECF Adv. P. No. 14-02407 Doc. # 4-14.

## D.    The Parties' Contentions

The Fox Parties filed the *DJ Complaint* on August 29, 2015 and subsequently filed their motion for a declaratory judgment, essentially a motion for summary judgment.  According to the Fox Parties, the *PTAC* asserts non-derivative claims because it seeks damages arising from Picower's participation in the Madoff Ponzi scheme, (*Fox Brief* at 5-6), and the allegations are now factual and supported by the Madoff Deposition.  (*Id.* at 8-15.)

The Trustee and the Picower Parties responded[8] that the allegations in the *PTAC* are a compilation of the Fox Parties' and the Goldman Parties' prior, dismissed complaints, (*Trustee Brief* 16-18 & *Picower Brief* at 12-13, 32-33), the Fox Parties mischaracterize the Madoff Deposition, (*Trustee Brief* at 18-21 & *Picower Brief* at 16-21), and allegations regarding Picower making loans or agreeing to be an options counterparty describe trading within the Picower Parties' own accounts, are conclusory, and are unsupported by the referenced sources.  (*Trustee Brief* at 22-27 & *Picower Brief* at 10-12, 23-30.)  The Trustee added that the *PTAC* violates the automatic stay, (*Trustee Brief* at 32), and undermines the Second Circuit's decision in *In re BLMIS*, 654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 25 (2012), which held that net equity claims against the BLMIS customer property estate were limited to a customer's net investment (*i.e.*, deposits less withdrawals).  (*Trustee Brief* at 33.)  The Picower Parties also

---

[8]     *See Trustee's Memorandum of Law in Opposition to Motion for Declaratory Judgment*, dated Dec. 18, 2015 ("*Trustee Brief*") (ECF Doc. # 25), *and The Picower Parties' Memorandum of Law in Opposition to the Fox Plaintiffs' Motion for Declaratory Judgment*, dated Dec. 18, 2015 ("*Picower Brief*") (ECF Doc. # 23).

requested that the Fox Parties be denied leave to replead, (*Picower Brief* at 33), which I assume refers to the *PTAC* rather than the *DJ Complaint*.

The Fox Parties replied in further support of their application, (*see Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion for a Declaratory Judgment*, dated Jan. 14, 2016 ("*Fox Reply*") (ECF Doc. # 30)), and submitted a declaration by Madoff dated Nov. 17, 2015 ("Madoff Declaration")[9] which was previously provided to the Court in connection with an unrelated application. Although that unrelated application had nothing to do with the Picower Parties, the declaration nevertheless included the following paragraph:

> Post 1990, I was put under enormous financial pressure by Jeffry Picower, who created the fraud I perpetrated and who was, by far, the primary beneficiary of the fraud. In order to raise money, I began to defraud my customers but I never sent checks to customers who did not request withdrawals in writing.

(Madoff Declaration, ¶ 4.) The Fox Parties contend that the Court must accept their allegations as true when determining whether the claims are non-derivative, and should not make credibility determinations absent discovery and an evidentiary hearing. (*Fox Reply* at 4-11.)

Responding to the Fox Parties' belated introduction of the Madoff Declaration in their reply, the Trustee and the Picower Parties each submitted sur-reply letters ("*Trustee Sur-Reply*"[10] and "*Picower Sur-Reply*,"[11] respectively). They argue that the

---

[9]     *See* ECF Doc. # 31-2.

[10]    ECF Doc. # 33.

[11]    ECF Doc. # 34.

Madoff Declaration, like the allegations in the *PTAC*, is conclusory, (*Picower Sur-Reply* at 2), and fails to support a non-derivative claim. (*Picower Sur-Reply* at 2 & *Trustee Sur-Reply* at 2-3.)[12]

After the February 11, 2016 hearing on the matter, the parties made supplemental submissions to the Court regarding the January 2017 decision in *Goldman III* which concluded that the *Goldman Complaint* had violated the Permanent Injunction.[13]

## DISCUSSION

### A.    Introduction

The principal question is whether the *PTAC* asserts claims that are derivative or duplicative of the claims that the Trustee asserted or could have asserted against the Picower Parties, or instead, asserts direct claims that belong to the Fox Parties.  A claim is derivative if it arises from "harm done to the estate" and seeks "relief against third parties that pushed the debtor into bankruptcy."  *Fox II*, 740 F.3d at 89 (citation and internal quotation marks omitted); *accord Picard v. JPMorgan Chase & Co.* (*In re BLMIS*), 721 F.3d 54, 70 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2895 (2014); *Goldman I*, 2013 WL 5511027, at *5 ("Put simply, a derivative claim is one in which a creditor seeks to usurp the estate's claim or assert a claim on behalf of the estate against a third party.") (footnote omitted).  "If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the

---

[12]    The Fox Parties moved to strike the sur-replies, (ECF Doc. # 37), which the Court denied. (*Transcript of Feb. 11, 2016 Hr'g* at 26:7-16.)

[13]    *See* ECF Doc. ## 46 & 48.

outcome of the trustee's action." *St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989); *accord Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, 121 F. Supp. 3d 321, 334 (S.D.N.Y. 2015) ("[G]eneral claims affect the creditors as a class; they are not unique to individual creditors.") , *aff'd*, 821 F.3d 349 (2d Cir. 2016). In contrast, a non-derivative claim arises from the wrongdoer's breach of a separate legal obligation owed to the victim, *Goldman I*, 2013 WL 5511027, at *5, that results in an injury particularized as to the victim. *Fox II*, 740 F.3d at 88.

While the same allegations "may give rise to both derivative and independent claims, [the Fox Parties] may not state independent claims merely by asserting new legal claims or seeking different forms of relief than the Trustee." *Fox IV*, 531 B.R. at 351 (citation omitted); *see also Fox II*, 740 F.3d at 91 ("We are nonetheless wary of placing too much significance on labels [the Fox Parties] attach to their complaints. . . ."); *Goldman I*, 2013 WL 5511027, at *6 ("[The Goldman Parties] cannot expect that the mere invocation of the words 'securities claims' requires the Court to ignore the substance of what their complaints actually allege.").

In the following sections, the Court addresses whether the *PTAC* facially alleges non-derivative claims, and if not, whether the inclusion of the Madoff Deposition and Declaration alters that conclusion.

**B.    The *PTAC*'s Allegations**

Much of the *PTAC*'s allegations are identical to those in the Fox Parties' *Second Amended Complaint*, dated Feb. 5, 2014 ("*Prior Complaint*").[14]  There, the Fox Parties pressed the same six counts, including that Picower was a "control person" under section 20(a) of the Exchange Act and liable for Madoff's primary violation of the securities laws.  The *Prior Complaint* alleged that Picower had a close relationship with Madoff professionally and socially, (*Prior Complaint*, ¶ 41), demanded high returns in his BLMIS accounts including by directing back-dated trades to show large fictitious gains, (*id.*, ¶¶ 42, 44, 45), encouraged others to invest with BLMIS, (*id.*, ¶¶ 46, 54), directed BLMIS to show losses in his accounts to reduce his tax liability, (*id.*, ¶¶ 47, 48), knew that fictitious trading would result in BLMIS making inaccurate regulatory disclosures and sending customers faulty customer statements, (*id.*, ¶¶ 51, 52, 53, 54, 56), and directed BLMIS to extend a $6 billion margin loan to a Picower-controlled account.  (*Id.*, ¶¶ 58–61.)

In determining that the *Prior Complaint* violated the Permanent Injunction, this Court ruled that the "allegations [were] conclusory and based on the [Picower Parties'] ability to withdraw funds and cause BLMIS to doctor the records of their own accounts." *Fox III*, 511 B.R. at 394.  The Fox Parties' assertion that Picower's fictitious transactions caused BLMIS to send false financial statements to other customers was "based on the secondary effects of the fraudulent transfers to the Picower [Parties] and [was] inseparable from the Trustee's claim." *Id.*  Furthermore, the assertion that Picower

---

[14]    A copy of the *Prior Complaint* is available at ECF Doc. # 26-2.

encouraged others to invest in BLMIS was wholly conclusory.  *Id.*  The Court concluded

that the allegations in the *Prior Complaint* pled "nothing more than steps necessary to

effect the [Picower Parties'] fraudulent withdrawals of money from BLMIS."  *Id.* at 395

(quoting *Fox II*, 740 F.3d at 96 (internal quotations omitted)).

District Judge Koeltl affirmed.  He ruled that the *Prior Complaint*'s allegations

were "entirely conclusory" and lacked "particularized allegations about any

misrepresentations made by the Picower parties or direct involvement of the Picower

parties in misrepresentations by Madoff."  *Fox IV*, 531 B.R. at 352.

The *PTAC* does not suggest otherwise; the Fox Parties still allege that Madoff

made the representations that deceived them but argue that Picower made Madoff do it.

(*DJ Complaint*, ¶ 25 ("Plaintiffs seek compensatory and punitive damages against

Picower and the Picower Defendants resulting from Plaintiffs' reliance upon

misrepresentations made to them by Madoff and his associates and as a result of the

fraud committed by Madoff, under the direct or indirect control of Picower and the

Picower Defendants.").)  The Fox Parties nevertheless assert that "unlike the prior

complaints" they are not seeking the monies that BLMIS fraudulently transferred to

Picower; instead, they "seek compensatory and punitive damages against the Picower

[Parties] resulting from [their] reliance upon misrepresentations made to [them] by

Madoff and his associates under the direct or indirect control of Picower."  (*Fox Brief* at

2; *accord id.* at 5; *Fox Reply* at 1.)  But these are the same damages the Fox Parties

previously sought.  (*Compare PTAC*, ¶ 132 ("Pursuant to Section 20(a), by reason of

Picower's control of Madoff and his domination and control of the Picower Entities, all

Defendants are jointly and severally liable as a control group to the same extent as

Madoff for Plaintiffs' damages resulting from Madoff's violations of Section 10(b) and Rule 10b-5.") *with Prior Complaint*, ¶ 121 ("Pursuant to § 20(a), because of Picower's control of BLMIS and Picower's domination and control of the Picower Parties, the Picower Parties are jointly and severally liable as a control group to the same extent as BLMIS itself for Plaintiffs' damages . . . .").) Thus, the damages are nothing new.

## C.    The New Allegations

### 1.    Propping Up and Option Counterparty

What is new are the allegations regarding the "propping up" loans and Picower's permission to use his name as an option counterparty on statements, and the Madoff Deposition and Declaration.  The *PTAC* alleges that Picower (1) made two loans totaling approximately $200 million when BLMIS needed liquidity, (¶¶ 71-78), and (2) agreed to be listed as an options counterparty to create the appearance of legitimacy.  (¶¶ 65-70.) These allegations did not appear in prior iterations of the Fox Parties' complaints, but did appear in the Goldman Parties' latest complaint.  (*See Goldman Complaint*, ¶¶ 67-75 (describing the $200 million in loans made by Picower to prop-up BLMIS); *and id.*, ¶¶ 76-81 (describing Picower's agreement to be listed as Madoff's options counterparty to create the appearance of legitimate trading).)

The allegations in the *PTAC* and the *Goldman Complaint* respecting these two issues are practically identical; in fact, the *PTAC* lifts much of the language from the *Goldman Complaint*:  A "critical aspect" of the Ponzi scheme was to create the appearance of legitimate trading to "induce prospective and existing" customers to invest or stay invested in BLMIS.  (*PTAC*, ¶ 65; *Goldman Complaint*, ¶ 76.)  Madoff was "continually concerned" that the institutional broker-dealer counterparties that BLMIS

identified as phony options counterparties "would become subject to heightened scrutiny from regulators and from large institutions" that did business with BLMIS. He thus needed new counterparties to continue "tricking regulators [and prospective and existing] customers into believing Madoff was actually engaged in large-scale options trading." (*PTAC*, ¶ 66; *Goldman Complaint*, ¶ 78.) So, Madoff and Picower agreed that Picower "would be listed on [Madoff's] fabricated books and records as a counterparty for a large volume of options trading." (*PTAC*, ¶ 67; *Goldman Complaint*, ¶ 79.) If regulators called Picower about the options transactions, he would not disclose the fraud to them. (*PTAC*, ¶ 69; *Goldman Complaint*, ¶ 79.) Moreover, Picower engaged in "'lending' transactions amounting to more than $200 million" to "prop up the [Ponzi] scheme." (*PTAC*, ¶ 71; *Goldman Complaint*, ¶¶ 67, 73.) These loans gave Picower leverage over Madoff because refusal to lend would have resulted in the demise of the Ponzi scheme. (*PTAC*, ¶ 80; *Goldman Complaint*, ¶ 67.) Both the *PTAC* and *Goldman Complaint* focused on two loans: a $76 million loan in 1992 to repay investors of Avellino & Bienes ("A&B") – a BLMIS feeder fund – when A&B was under investigation by the SEC, (*PTAC*, ¶¶ 71-75; *Goldman Complaint*, ¶¶ 68-69), and a $125 million loan in 2006 to keep Madoff "afloat when [BLMIS] was short on cash" to satisfy customer redemptions. (*PTAC*, ¶¶ 76-79; *Goldman Complaint*, ¶ 70.)

Both pleadings attempted to connect the new allegations to the information disseminated to putative class members. In substance, they contended that Picower's machinations caused BLMIS to falsify its own books and records and send this false financial information to customers, and the customers relied on this false financial

information in investing in BLMIS.  (*PTAC*, ¶¶ 81, 90; *Goldman Complaint*, ¶¶ 7, 74, 91,

99.)

      This Court considered the "propping up" and "counterparty" allegations in the

*Goldman Complaint*, and concluded that they were insufficient because "the propping

up loans, the counterparty conspiracy and everything else the [*Goldman Complaint*]

alleges Picower did were incident to the fraudulent withdrawals of $7.2 billion."

*Goldman II*, 546 B.R. at 300.  Further, these allegations were common to BLMIS

customers:

> [T]he propping up loans and counterparty fraud injured the BLMIS estate
> and indirectly affected all creditors in the same way.  The propping up
> loans rendered BLMIS insolvent . . . and BLMIS' inability to satisfy its
> investors' redemption calls ultimately drove BLMIS into bankruptcy. . . .
> Similarly, the fictitious option trading records allowed the scheme to
> continue driving BLMIS deeper into insolvency.

*Id.*  This Court concluded that the allegations were "nothing more than steps necessary

to effect the Picower [Parties'] fraudulent withdrawals of money from BLMIS, instead of

'particularized' conduct directed at BLMIS customers."  *Id.* at 300-01 (quoting *Fox II*,

740 F.3d at 84).  Moreover, the allegations of reliance on the false financial information

alluded to in the *Goldman Complaint* were "wholly conclusory."  *Id.* at 302.

      District Judge Woods affirmed.  After recounting the history of the litigation

surrounding the multiple Fox and Goldman pleadings, he concluded that the Goldman

Parties asserted a general claim that affected all BLMIS investors in the same way, that

could have been brought by any BLMIS customer and that was not based on any

conduct by the Picower Parties directed to any particular putative class member.

*Goldman III*, 2017 WL 383490, at *8-9.  The Permanent Injunction therefore barred the

claim.  *Id.*, at \*9.  Despite the inclusion of the "propping up" and "counterparty" allegations "pleaded to thread the eye of the needle outlined by the prior decisions in this line of cases," the *Goldman Complaint* was "functionally similar" to the prior complaints.  *Id.*  The propping up and counterparty allegations described how Picower engaged in "various categories of fraudulent conduct which had the purpose and effect of further effectuating Madoff's Ponzi scheme; the complaint itself [was] replete with assertions that Picower's fraudulent activity deceived customers, as a group, into investing and staying invested with BLMIS."  *Id.*  The District Court agreed with this Court that the loan and counterparty allegations were incident to Picower's fraudulent withdrawals and "amounted to two generalized categories that pushed the debtor into bankruptcy."  *Id.* (citation and internal quotation marks omitted).  "Simply put, the 'alleged wrongful acts harmed every BLMIS investor (and BLMIS itself) in the same way.'"  *Id.*, at \*10 (quoting *Fox I*, 848 F. Supp. 2d at 480).  Furthermore, the allegations of reliance were wholly conclusory.  *Id.*  The holdings of this Court and the District Court regarding the propping up and counterparty allegations in the *Goldman Complaint* apply to the analogous allegations in the *PTAC*, and they fail to form the basis of a non-derivative claim for the same reasons.

The *PTAC*'s attempt to bolster the allegations generally relies on the prosecutors' questions and ignores the contrary testimony given in the criminal proceeding styled *United States v. Bonventre, et al.*, No. 10-cr-228 (LTS) (S.D.N.Y.).[15]  For instance, the Fox Parties claim that Frank DiPascali testified that Madoff and Picower agreed to list

---

[15]    While the *Goldman Complaint* lacked direct citations, it relied upon the *Bonaventre* trial testimony in drafting the complaint.  (*See Goldman Complaint* at 1-2.)  The transcript from the criminal trial is available at ECF Adv. P. No. 14-02408 Doc. # 4-9 through 4-33, and references to it will be denoted as "(Trial Tr. at ___)."

Picower as an options counterparty.  (¶ 67.)  However, the cited portion of the transcript

actually supports the opposite conclusion—that Madoff acted unilaterally:

> Q:  And am I correct that you had a discussion with Mr. Madoff about this strategy, so to speak, of putting [Chais, Shapiro or Picower as options counterparties]?
>
> A:  It was entirely [Madoff's] idea.  Yes, we did have a discussion.
>
> Q:  This was Bernie's idea, right?
>
> A:  Exactly.

(Trial Tr. at 5824:24-5825:4; *see also id.* at 5342:8-10 ("[Madoff] decided to internalize

the option trades, literally telling the regulator that the other side of Fairfield's trade is

another Madoff client . . . .").)

Nor do the cited portions of the trial transcript support allegations that Picower

made $200 million in loans to keep the Ponzi scheme afloat:

> Q:  And isn't it a fact, Ms. Bongiorno . . ., that these securities were used by Madoff Securities to enable it to pay off Avellino and Bienes and get out of this situation?
>
> A:  How would I know that? I have no idea. . . .
>
> A:  You asked me if they paid for Avellino and Bienes.  I don't know that. Nobody told me that.  I do not know that.

(Trial Tr. at 10436:25-10437:24.)

> Q:  And that's the $125 million that Mr. Picower wired to Madoff Securities, right?
>
> A:  That's what it says, yes.
>
> Q:  But, in fact, this is a loan that Mr. Picower is making, isn't it?
>
> A:  I don't know that, Mr. Zach.
>
> . . .
>
> Q:  And it's still your testimony that he didn't make a loan to Madoff Securities when it was in financial distress in 2006?
>
> A:  I don't know anything about a loan.

(Trial Tr. at 10450:6-11, 10463:25-10464:2.)  In short, the *PTAC*'s citation to the *Bonventre* criminal trial testimony does not bolster the Fox Parties' allegations that Picower made propping up loans or agreed with Madoff to be listed as an option counterparty.

### 2.    The Madoff Deposition

This leaves the Madoff Deposition and the Madoff Declaration.  The Fox Parties argue that the Madoff Deposition infuses the *PTAC's* allegations with the particularity that the Courts had previously found lacking.  (*Fox Brief* at 9-10.)  According to the Fox Parties, the references to Picower in the Madoff Deposition "are damning" as Madoff stated that the fraud was started at Picower's behest, for Picower's benefit, and to cover losses that Picower had sustained.  (*Id.* at 9.)

The Fox Parties' misstate Madoff's testimony.  According to Madoff, he was a legitimate trader until he began the Ponzi scheme sometime in 1992.  Going back a little before then, his principal clients consisted of four significant investors – Jeffry Picower, Carl Shapiro, Norman Levy and Stanley Chais (the "Domestic Investors").  These investors were interested in achieving long-term capital gains requiring that the securities be held for at least one year.  (Madoff Deposition at 32:8-33:3.)  They also sought to defer taxes on their gains, and prior to the 1987 stock market crash, they used straddles and "Mickey Mouse type of hedging strategies, tax shelters," which the Government was disallowing.  (*Id.* at 42:21-25; *see* 44:24-45:14.)

Madoff recommended a revised strategy of developing long-term gains in the equity market, but the Domestic Investors raised concerns about a decline in the

market.  (*Id.* at 43:1-11.)  They also wanted to defer the taxes on their long-term gains.  (*Id.* at 44:8-11.)  At the same time, Madoff was also engaged in business with a French private investment bank, Banque Privee de Gestion Francais ("French Bank").  (*Id.* at 33:4-10.)  The French Bank invested in U.S. securities through BLMIS, (*id.* at 34:16-36:4), but did not want to be exposed to the U.S. stock market, and asked Madoff to hedge its market risk.  (*Id.* at 36:5-37:4.)  Accordingly, Madoff sold options to the French Bank, and the counterparties to these options were the Domestic Investors.  (*Id.* at 38:5-40:8.)  The understanding for both the Domestic Investors and the French Bank was that the options were to be held for some extended period of time because (i) the Domestic Investors needed securities to be held for at least a year, and (ii) the French Bank wanted continued hedging against their portfolio of U.S. securities.  (*Id.* at 40:9-19.)

The Domestic Investors accrued long term gains through this arrangement until the stock market crashed in 1987.  Concerned that the market was going to continue to decline, the Domestic Investors wanted to protect their gains and pressured Madoff to sell their long equity positions.  (*Id.* at 42:9-45:18.)  Madoff claimed that the Domestic Investors' demands put him in an "awkward position" because he "felt obligations" to the French Bank on the other side of the hedges.  (*Id.* at 46:6-20.)  As a result, Madoff made his first blunder; he "foolishly decided" to "step in . . . and . . . take [the Domestic Investors'] position on the short side of the option, which meant that basically [he] was at risk" should the market go up.  (*Id.* at 46:21-47:4.)  In return, the Domestic Investors agreed to hold Madoff harmless for any losses that he suffered.  (*Id.* at 47:8-48:18.)  The

market eventually rose, and as a result, Madoff owed "a couple billion dollars" on account of the transactions.  (*Id.* at 49:7-24, 52:17-23.)

When it appeared that Picower (and presumably the other Domestic Investors) would not indemnify Madoff for the options losses, Madoff decided that he had to increase the size of his investment advisory business by accepting investments from fund managers who had previously wanted to invest with him.  (*Id.* at 52:9-53:12.)  His investment advisory business hit a snag in the early 1990s when the markets were in recession because of the Gulf War.  (*Id.* at 57:17-25.)  Clients became frustrated with the lower than expected returns.  (*Id.* at 59:13-17.)

At this point, Madoff made his "second blunder."  (*Id.* at 59:18.)  Although he was earning two percent on the funds' investments, he paid the funds twelve or thirteen percent in profits and sent them confirmations depicting "bogus" transactions that showed fictitious gains on securities Madoff had never purchased.  (*Id.* at 60:2-17, 64:10-21.)  He decided to "take the risk" because he thought the situation was temporary and would work itself out, but it didn't.  (*Id.* at 103:11-18.)  He eventually "became aware of the fact that I was not going to be able to extricate myself from this mess, and then didn't have the courage or the character, you know, to -- to fess up to it."  (*Id.* at 103:19-23.)

As Madoff confirmed, it was the losses resulting from the assumption of the Domestic Investors' hedges, and their failure to honor their indemnification obligations, that caused him to look elsewhere for the money to cover his losses:

> And [after my arrest] I became aware of the fact that Picower had an estate of nine billion dollars.  It was reported in the papers.  So, in spite of the

fact that he told me he was wiped out and couldn't have – didn't have the
money [to indemnify me for losses to the French Bank], which is why I
started doing all of this, because I realized he's not going to be able to
make me whole, and I'm not going to be able to make the money I lost on
the hedges.  So that's what started this whole cycle.

(Madoff Deposition at 111:14-23.)

Later in the deposition, Madoff was asked whether he was sorry for what he did.

He answered that he was sorry, (*id.* at 107:24-108:3), but felt good that he had ignored

his attorneys' advice to cooperate with the prosecutor and instead decided "to get money

back from the people that were complicit in the crime, [n]amely Picower, Shapiro, Levy

and some of the other people." (*Id.* at 108:4-17.)  When asked why they were

"complicit," he explained that they had engaged in tax fraud by manipulating the trading

records in their accounts:

> A.      [T]hey had violated tax laws based upon what I discussed with them
> and other things that I knew that they were doing with people in my firm,
> bookkeepers, who are all now under investigation.
> . . .
>         And these people are all aware of the fact that I have information
> that will send them to prison.  That, you know, the best thing I can do
> would be to let these people know that unless they come forward with the
> money, then I am going to give the evidence to the government that I have.
> . . .
>         I said . . . you'd have to let me do this my way.  I contacted these
> people, and I said to them . . . when I was on bail . . . you either come
> forward or I'm going to release the information.
> Q.      When you say, "these people," who are you referring to?
> A.      Picower, Shapiro.

(*Id.* at 108:10-110:9.)

The Madoff Deposition does not supply factual material supporting non-

derivative claims that was missing from the earlier Fox Parties' complaints.  Madoff

never testified that Picower devised the Ponzi scheme, participated in its execution or assisted him in defrauding other BLMIS customers.  Instead, Madoff described how he assumed the Domestic Investors' hedged short positions to maintain good relations with the French Bank, a move that turned out to be a financial disaster when the markets rose and Madoff had to deliver stock he did not own to cover the short positions.  To compensate, he began accepting hedge fund investments, but when the hedge funds became dissatisfied with meager two percent returns, Madoff began to report fictitious trades and higher profits, presumably to dissuade them from withdrawing their investments with BLMIS.  The fictitious trading that Madoff viewed as a temporary fix snowballed into the full-fledged Ponzi scheme revealed in 2008.

Finally, Madoff's reference to Picower's "complicity" had nothing to do with the Ponzi scheme.  It referred to tax fraud relating to the manipulation of the records in Picower's own accounts.  (*See* Madoff Deposition at 108:20-109:12.)  These allegations are not new; the Fox Parties made the same assertion previously.  (*See Prior Complaint*, ¶ 47 ("Picower [and his agent] demanded that BLMIS manufacture fictitious losses for the Picower Parties . . . in order to reduce their state and federal tax liabilities")), and the Bankruptcy and District Courts ruled that these allegations related to Picower's manipulation of his own accounts, and were "thus duplicative of the Trustee's fraudulent transfer claims."  *Fox IV*, 531 B.R. at 353 (referencing *Prior Complaint* allegations including ¶ 47).  Similar allegations appeared in the Trustee's 2009 complaint asserting the fraudulent transfer claims that were resolved by the Settlement. (*See Complaint*, dated May 12, 2009, ¶ 60 ("Picower . . . directed purported purchases and sales of securities within Defendants' accounts, including direction that sales or

- 24 -

purchases be made for purposes of achieving gains or losses") (ECF Adv. P. No. 09-01197 Doc. # 1).)

### 3.    The Madoff Declaration

Last, the Fox Parties argue that the Madoff Declaration adds particularity to the *PTAC*'s allegations.  The Madoff Declaration was originally submitted in connection with an unrelated application made by BLMIS customer Aaron Blecker.  (*Motion for an Order Compelling the Trustee to Allow Aaron Blecker's SIPA Claim*, dated Dec. 28, 2015 ("*Blecker Motion*") (ECF Adv. P. No. 08-01789 Doc. # 12319).)  Blecker, who was represented by the same attorneys as the Fox Parties, moved to compel the Trustee to allow his customer claim in the BLMIS SIPA liquidation.  One of Blecker's arguments was that the Trustee failed to produce evidence that Blecker made withdrawals from his BLMIS account.  (*Blecker Motion* at 2-3.)

The Madoff Declaration was submitted in support of the *Blecker Motion*. (Madoff Declaration, ¶¶ 2-3.)  However, it inserted two statements about Picower having nothing to do with the *Blecker Motion*.  First, "[p]ost 1990, I was put under enormous financial pressure by Jeffry Picower, who created the fraud I perpetrated and who was, by far, the primary beneficiary of the fraud."  (*Id.*, ¶ 4.)  Second, BLMIS employee Frank DiPascali bore the most responsibility for the fraud only after "Picower and me."  (*Id.*, ¶ 5.)  The Fox Parties submitted the Madoff Declaration with the *Fox Reply* in support of their current application.

The "Picower insert" does not alter the Court's conclusion.  Statements that Picower "created" the fraud, (Madoff Declaration, ¶ 4) or, along with Madoff, bore

"responsibility" for the fraud, (*id.*, ¶ 5), are conclusory and lack specificity.  Had the *PTAC* included these allegations without attribution, they clearly would have been deemed conclusory and insufficient.  That Madoff said these things in a declaration does not change their conclusory nature.

It also contradicts his deposition in which Madoff accepted sole responsibility for the Ponzi scheme.  The short positions he took over from the Domestic Investors led to catastrophic losses, he took in fund money to grow his business and provide needed capital, and ultimately, he initiated the Ponzi scheme to keep the funds happy and dissuade them from withdrawing their investments.  Madoff never suggested that any of the Domestic Investors "created" the Ponzi scheme or forced him to start it.  It was his idea of a "temporary fix" to a liquidity problem.  Furthermore, the assertion that Picower was the primary beneficiary of the fraud is just another way of saying that he withdrew more fictitious profits from BLMIS than anyone else.  This is duplicative of the fraudulent transfer claim that the Trustee settled.

In the end, the Fox Parties have still not identified any conduct by the Picower Parties that was directed at a member of the putative class.  The *PTAC* does not allege that the Picower Parties contacted any putative class member, made a misrepresentation to a putative class member or sent or participated in the creation of false financial information that BLMIS sent to a putative class member.  Moreover, the allegations of reliance on the false financial information are wholly conclusory.  The Fox Parties have also failed to identify a particularized injury suffered by any putative class member.  All of the BLMIS investors suffered the same indirect injury resulting from the theft of the customer property and the demise of BLMIS and could assert the same

claim.  Thus, the Fox Parties' new allegations suffer from the same defect as their prior pleadings, and merit the same fate.

Accordingly, the Court concludes that the *PTAC* asserts derivative or duplicative claims in violation of the Permanent Injunction.[16]  The Fox Parties' motion for declaratory relief is, therefore, denied, and the *DJ Complaint* is dismissed.  The Court does not, however, grant the Picower Parties' request to deny the Fox Parties leave to replead.  The only pleading before the Court is the *DJ Complaint*.  In essence, the Picower Parties seek to enjoin the Fox Parties from filing another complaint against them, but they did not cross-move for injunctive relief in this adversary proceeding.  Nevertheless, the Court's refusal to deny leave to replead is without prejudice to the rights of the Picower Parties' and the Trustee's to seek sanctions in the event that the Fox Parties file another complaint against the Picower Parties, or seek the imprimatur of this Court to do so.  The Court has considered the Fox Parties' remaining arguments, and to the extent not discussed in this opinion, concludes that they lack merit.  Settle order on notice.

Dated:  New York, New York
        March 7, 2017

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge

---

[16]    In light of the Court's decision, the Court need not decide whether the *PTAC* also violates the automatic stay.